First case is Monsanto v. David, 2007-11-04. Mr. Johnson. Thank you, Your Honor. May it please the Court. My client, Lord David, is innocent of infringing the 605 pact, but he has an unreasonably, indefensibly large judgment against him now, and that judgment is the product of an unfair trial. Before I get to that part of this matter, I want to address the written description issue under the 605 pact. Now, Monsanto's brief misstates that issue. Monsanto's brief at page 1 states, That is not David's position. Monsanto, an inventor, can get a Section 101 patent on a plant gene. The issue is, can an inventor use a 101 patent on a plant gene to sue a farmer for infringement for saving seed from his own field planting the next crop year? J.M., the J.M. Court, recognizes... Your Honor, are you questioning whether a patent on the seed is infringed, a patent on the gene is infringed by a seed containing the gene? By saving the seed. If there is no patent on the plant... Your Honor, you're not questioning the dominance of the gene patent with respect to the seed containing the gene. You're dealing just with the same seed issue. With the saved seed issue. With farmers. Because... But counsel, didn't these farmers, your client included, sign a document agreeing that they would not use saved seed? David signed a contract based on, in 1999, not the year that he saved the seed, and he never bought any soybean seed that year in 1999 either. But he signed a contract that Monsanto, that was based on the 605 patent, and it claimed by Monsanto that under that patent it could prohibit seed saving. That is not what the Supreme Court held in J.M. The Supreme Court in J.M. was very concerned about the 40 years of legislative history in which Congress clearly demonstrated it intended to treat farmers differently, but it came to extending federal protection to plant varieties. They treat them differently than pills. There are no pill-specific statutes. That's why Monsanto... It sounds again that you're questioning whether one could have a utility patent on the seed. No. Of course you could have a utility patent on seed. J.M. held that. Then are you claiming that the utility patent is subject to different rules simply because this has to do with farmers? Yes. If you read J.M., the court said, well, we've got to somehow deal with the Plant Patent Act of 1930, and we've got to somehow deal with the Plant Variety Protection Act of 1970, and we've got to read these together. If you read Justice Scalia's concurring opinion, he agreed that you need to read those three statutes together. The point is that farmers have always had the right to save seed. J.M. said the reason that the patent statute allows you to take away that right is twofold. One, the written description requirement is so much more stringent. The patent statute isn't taking away a right. The patent statute provides a limited exclusivity with respect to what's patented. The right to exclude. But the Supreme Court, in analyzing the three statutes, reading them together, said that the reason that the PVP, the PVP, of course, became an exemption for seed saving and also for research by universities and other people. But J.M. court said the Section 101 patent has more stringent requirements. Therefore, it can provide greater protection to the inventor. And the more stringent requirements were that it required a more stringent written description because the PVP Act has a relaxed written description provision. And secondly, the seed has to be deposited in a public depository available to the public so that This isn't a right under the PVP Act. No. No. But the court is saying why, when you read Section 101, together with the PPA and PVP, why we are going to allow this more stringent, this greater protection of the patent act, despite Congress' express exemption of seed saving and PVP. And they said because it's harder to get a patent. Now, there's no... I'm sorry. I'm still confused, though. It's not that we're operating on a clean slate here. Monsanto didn't come along and just say, hey, your saved seed constitutes infringement. There was a contract. Your client agreed not to save seed. And they clearly did. At least that's what the court of law found and utilized it. So what are we to do with the contract that we signed agreeing not to do that? Well, but the basis of the contract is that the 605 patent is valid to prevent a farmer from saving seed. That's the basis of the entire contract. The contract can't extend in the actual rights granted under the patent statute. You can't extend? Are you suggesting this is tying to a patent? I'm sorry? Are you suggesting this is tying to a patent misuse, then? Is that what you're asking the court to find with regard to the patent? I'm saying that the contract cannot extend beyond the statutory grant of whatever the valid patent is. The contract should not be able to extend to be able to give the inventor greater rights than what the valid patent could actually gather. And this court has not been addressed with this issue based on asking you to analyze what JEM actually says as its reasoning behind allowing patents on plant brackets. And if you read, which I know you have, JEM states that it's the more stringent written description requirement and the seed deposit. There's no seed deposit here. No one skilled in the art can make or use this plant, whatever plant variety it was. And if Monsanto's own director of seeds in the U.S. has stated at trial that Monsanto could protect its rhino-predator technology, its other biotechnology by requiring those that it licenses to assert its genes in plant varieties to have a patent on that plant variety, and that they could enforce the patent on the plant variety that would keep people from saving seed. However, when they do that, they would have to test and do variety testing to test for what the specific variety is, not just going to test for the presence of the rhino-predator gene and build a circumstantial evidence case like this one. Dorsey, their head of U.S. seeds, said they don't like to do that because it's harder to test for specific varieties than to just test for the gene. But had that been the case here, the first thing Monsanto had to have done was go into Lauren David's fields and variety test, which Lauren David himself did. Monsanto never tried the variety test in this case. Lauren David had variety tests done because he knew that the only variety of Roundup Ready seed that he ever bought prior to 2003, which was 2040 Roundup Ready, was in his fields because he didn't save his seed and he didn't plant it. When we tried to get the PVP certificates in on the three varieties that David purchased in 2003, Monsanto resisted and successfully excluded them by saying, we do not contend that David ever planted those three varieties prior to 2003. We don't contend that he saved them and planted them in 2004. They contend that he saved the seed that he planted in 2002. That's the only Roundup Ready seed David ever planted before 2003 was 2040 Roundup Ready in 2002. We're getting into a lot of facts on which we know some deference, some of which are based on credibility determinations. Your Honor, what I want to point out here, what I want to move to here, is Monsanto's entire case is built on this gene testing that was done by Ipjala and Gast. We've never testified, we've never listed as experts in this case. It was just parroted by Fritz Karpacek, who has his degrees in neurology. He's not a biochemist, he's not a plant geneticist. He didn't do the test. All he did was write one sentence saying the tests show that they were 100% Roundup Ready gene. Rule 703 does not allow tests to be performed by paid, non-testifying experts for the purposes of litigation and then have some other expert who's been paid $2.4 million over the last several years to testify in Monsanto's case who's an expert at testifying but is not an expert at doing these tests. It does not allow those non-business records, those are not 8036 business records. The people that did the work have to come into court and testify. Monsanto got our expert thrown out because he wasn't listed, the man that did the variety testing, and the man that did the gene testing for us that showed 32% of the genes were negative for Roundup Ready. They couldn't testify because they weren't listed as experts in time by the Pirate Council and they weren't listed as experts by the Pirate Council in time because Loren had the seeds tested himself because he knew it would exonerate him. If you have a lot of time, you can save it or use it as you wish. Thank you, Your Honor. I want to make clear here that the principle that the district judge used to exclude our seed testing, our variety testing records that exonerated my client, the principle was that we didn't have the experts there to testify to lay foundation for the testing because they were named late. The reason that my objection to the allowance of all this testimony on these unsworn documents is that they never listed the experts that did these tests. They never testified in court, the experts that did these tests. It's the same principle, and that is an abuse of discretion for a district judge to exclude the evidence, exonerating evidence, exclude my client's exonerating evidence, and then apply the very same principle opposite with the other party and allow in their evidence through a conduit expert, allowing non-testifying experts to perform tests for purposes of litigation that were not 8036 business records. They were inadmissible hearsay. Thank you. We'll save the rest of your time. Mr. Sankar. Thank you, Your Honor. My name is Sam Sankar. I'm with the Monsanto Company and Monsanto Technology LLC. I'd like to respond to a few of the points that Mr. Johnson's made. Mr. Johnson's clarified, I believe, that his position is that seed saving may not constitute infringement. I believe that this Court has repeatedly addressed this issue in the Farland cases, in the Scruggs case, in the Winterof case. It's made it very clear that replanting saved, rounded-up, ready seed constitutes infringement because the license that growers get does not allow them to do that. With respect to the JVM case, the JVM case says in very clear terms that neither the Plant Variety Protection Act nor the Plant Protection Act modify the explicit terms of Section 101. A company can get a patent on a gene that reads on a plant, and as a result of that patent can enforce a patent against any grower who raises that plant. Section 101 has higher requirements for obtaining a patent, and Mr. David has not suggested that Monsanto be able to meet any of those requirements. With respect to the issue of infringement and evidence of infringement, Monsanto proved its infringement case in three basic steps. First of all, Monsanto proved that Mr. David planted over 2,000 acres of soybeans on his farm in 2003. Mr. David does not appear to contend that that figure is wrong in any way. In addition, Monsanto proved that Mr. David only bought 645 units of legitimately licensed soybean seed in 2003. Now, Mr. David has claimed throughout this litigation that he bought additional licensed soybeans that he had used to plant his 2003 crop. As Your Honor suggested, the district court rejected it on the basis of credibility decisions, all of Mr. David's propositions in this respect, and found that only 645 units of licensed seed were purchased for that year. And last, Monsanto used plant genetic testing to show that all of the plants on Mr. David's farm in 2003, all the soybean plants, I should say, carried the Roundup Ready trait. Mr. David suggests that this evidence that Monsanto presented was in some way erroneously admitted, but what actually happened was the expert witness, Dr. Fritz Kopitschek, testified on the basis of data collected by sampling personnel and analyzed. Is this the hula hoop testing? There's two parts of it. How that really works, it seems awful. Well, there's two parts of the testing. The genetic testing has nothing to do with the hula hoop experiment. The testing of the planting density happens using the hula hoop because it's a readily obtained and very standard diameter object. I've got lots of little children, and hula hoops come in many different diameters as far as I can tell. I assume you standardize somehow for them. I assume that there is the official world hula hoop sanction standard. Hula hoop is the size that was used. I take it that this was not simply some available device that they picked up. This is the way it's done, believe it or not, with the hula hoop on a regular basis when you're testing for the density. That was the testimony of trial. In fact, this is a standard agronomic tool. This wasn't something that somebody had in their trunk, and they just pulled it out. No, not at all. As a scientific matter, I believe you could use any object you wanted as long as you knew the area inside the object. I think in this case, many agronomists do because they know it's a circular object that has a specific amount of area encompassed in it. If you drop it on the ground, it's a very easy thing to do. Just out of curiosity, how exactly were these tests done? As I understood it, Mr. David was not made aware of the fact that the test was even going on. Or did he get permission for anyone to come onto his property and do these tests? Don't you think he had a right to be present? He was absolutely present during the testing. The tests were done pursuant to a court order. One of Mr. David's complaints was there was only one of him, and I believe his wife might have been there as well, and he wasn't able to accompany all the sampling teams. The situation was not that Monsanto marched onto his farm. In fact, Monsanto had requested access to the farm by permission many times previously, and Mr. David had staunchly resisted that at every opportunity. When the time came, you'll notice in Mr. David's briefs, he complains that it took some time for Monsanto to actually come onto the property and sample this. And that's because Monsanto was working to try to get an amicable resolution of this thing, because Mr. David was consistently changing his stories about exactly what happened. Counsel, one thing that has troubled me in this case is the district court seemed to, in a very cursory fashion, arrive at some of the damages calculations, adopting the royalty rate rather than being elsewhere, rather than analyzing the Georgia-Pacific factors and other things. One that gave me a particularly large amount of trouble is 107.5 pounds of seed per acre. Tell me how you understand the district court to come to that conclusion, that that is the correct average amount that ought to be used for purposes of calculating damages. So, as the district court noted, that figure came from averaging two numbers. The first number was the 95 pounds per acre figure that Dr. Kopchick presented, and that was the figure he calculated by using the hula hoop in a couple of different places. Is that exact? Because somewhere I read 8 pounds per acre somewhere as well. I believe it's 95. I believe he testified that it's 95 pounds per acre. And they did that literally by counting... I had the same question, and maybe you can comment on it. 295 of the appendix... There's a reference at the top of the page to... Monsanto's expert concluded that you planted at least 80 pounds per acre. Is the 95, is the 80 the... I'm sorry, I... I'm sorry. 295 of the appendix... Oh, so this is during the deposition of Mr. David, right? I don't know actually... This was a deposition testimony directed from Mr. David, and as to what number Monsanto's counsel was referring to, I don't know. The expert report, which appears... You can see the number at 593 of the joint appendix. And the expert report that Mr. David got a year and a half or so before the trial clearly says 95 pounds per acre. Now, what about the other number of district court sites, which is 120? The other number is 120 pounds per acre. That's a seating figure that Mr. David himself conceded. Right, it's actually, don't quote your book, it's on that same page. It's on that same page, right. But it seems awfully clear to me on the preceding pages when he's discussing it, that he's talking very clearly about conventional seed, not the Roundup Ready. What he testified to during his depositions was that, I plant at varying different rates. I plant at a lower rate for Roundup Ready seed. Why? Because it's expensive, because I have to pay for it. Now, I think it's a very fair inference that when he's saving the seed and not paying for it, he would plant at a much higher rate, so as to get a higher yield out of it. Given, I think the court has already recognized that there were a fair amount of credibility inferences and determinations made by the district court in this situation, Mr. David testified to wildly varying planting rates during various different depositions in a trial. I think it was well within the district court's discretion to say, look, I'm picking the number, the high number. I'm sorry. The district court did not draw, as I recall, the inference that you just drew. You're, I think, extrapolating from the evidence and offering the inference to us. You're not suggesting, I think, that the district court made the statement about it. Not explicitly, no, Your Honor. And it does seem to me, it wasn't just on 295, but also on, I guess it's page 500, there's another reference to 120, which also seems to be a maximum for conventions. Right. But your expert is saying 95 is the number that... Did I ask the right question? Yeah. I'm troubled also with how the district court number one picked 120 as just being the highest number out there for any kind of seed. And they leveraged that with the expert's 95 and came up with what strikes me as this more artificial number, 107.5. Well, the first thing, and I think the court understands this, is that the district court is due a fair amount of deference in this fact-finding endeavor. As the district court itself said, there was a lot of information from Mr. David about varying planting rates. Counsel, show me where else it says 120, because the two places I've seen it, 295 and 500, are both talking about conventional seed. I agree we give clear air deference to fact-findings, but unless I'm missing another piece of evidence in the record, this fact-finding is clearly wrong. I think the important factual thing you need to understand here is that when Mr. David said, I sometimes plant at a much higher rate for conventional seed than I do for Roundup Ready seed. Roundup Ready seed and conventional seed don't look any different. They're exactly the same. The only reason he would plant at a lower rate for Roundup Ready seed is because it costs him more money. And so as we explained at trial, there's no reason why you would limit your planting rate for Roundup Ready seed if you weren't paying for it, if you were using it from your saved seed stockpile. So when there's no cost limitation on the density at which you're planting, then you're going to plant at the rate that you would plant. The reason why he was planting conventional seed at a higher rate was because it was cheaper, not because of any agronomic reason. So it's not the case that the Roundup Ready seed has a greater realization rate or something like that? I think there was testimony at the damages stage about the fact that Roundup Ready seed has revealed characteristics and all that, but as far as why Mr. David planted at a higher rate for conventional seed, I think the only testimony was that it was because it was more expensive to get Roundup Ready seed, and so you skipped a little bit on your planting in order to get the full crop, or in order to make a little bit more money. And I think that's the difference. What about the argument that Mr. David makes about the way the expert testimony came in here? Now, I understand the 703 argument, that evidence on which an expert relies need not be demonstrated to be invisible evidence. But his argument goes a little farther than that. It says that in effect, what you've got is someone who isn't really an expert, but is simply reporting the work done by other people who may be experts, and therefore shielding them from the process animation that would normally be directed at the expert who's simply relying on data gathered by the functionaries. I think that is what I understand Mr. David's argument. It doesn't fit the facts of this case. Dr. Kopitschek is the guy who designed the sampling protocol. He fully understands how ELISA testing is supposed to work. He trained and supervised the analysts who did the actual work. Mr. Ojala and Ms. Gast, I don't believe anybody has said that they are, in fact, experts in any way. What they are is people who conducted the mechanical assays and handed the numbers to Dr. Kopitschek. In that situation, Rule 703 is the clear authority here and says that the expert is entitled to rely on data whether or not the data is admissible itself into evidence. The situation here, I think it's very clear that Dr. Kopitschek was an expert, that ELISA testing data was something that agronomists like himself reasoned for. His area of expertise, what does he qualify as? I believe he's an agronomist. He's a PhD agronomist, and I believe, although I won't square this, and I can double check it, that he actually had done his thesis work on ELISA testing of certain kinds of crops. This is somebody who was extremely experienced in this particular area and had done this. One of the other things I think that's important to note here is that, first of all, questions about the reliability of the data that an expert relies upon go to the weight that the finder of fact gives to the testimony of the expert. As long as there is data there, the district court is supposed to admit it and then sort of let the opposing counsel cross-examine the expert, let him bring out any inaccuracies or inadequacies in the data. Mr. David never deposed Dr. Kopitschek, even though he had ample opportunity to call his witnesses, the various sampling technicians, the various analysts. All those people were named to Mr. David months and months before the trial. He never actually sought to take their depositions, put them on the witness stand to see what it was that Dr. Kopitschek was supposed to be hiding. I understand that his expert evidence was excluded on grounds of untimely innocence. That's right. Do you have a quick response on the merits to his assertion that that evidence would have been exculpatory and if it didn't, it was exculpatory, but wasn't admitted? Judge Parson, I don't think I can respond to that with factual evidence that's in the record. No. We've looked at the materials. We've looked at it. I find them a little hard, given the fact that there isn't an evidentiary accompaniment to that evidence. Hard to see exactly where that evidence points us. Do you have a reaction to that evidence that would respond to his contention that it is indeed exculpatory? To be perfectly honest, I believe that our trial team had no confidence that the samples that Mr. David had sent to this lab were in fact samples from his field or were accurate representations of what he had been growing. And to actually go and prove that up and to say, look, Mr. David, these seeds that you sent this scientist during a time when you weren't even represented by counsel weren't actually the right seeds, that would have taken a lot of time, a lot of energy, and a lot of testing. So your challenge, aside from timing, went to the way that the samples were obtained as opposed to some failure of the proper inferences being drawn from the data that was collected. Oh, absolutely. To be clear... Much more informal than the latter. Much more informal than the latter. I'm still going to try to make sure that I've got that right. But the key thing to understand here is our patent reads on claims of gene and not a plant variety. So to prove infringement, we had to prove that the gene was in the plants that were in Mr. David's field. That's what we proved with the genetic testing. My time is almost up if the court has any further questions. There are no further questions, but almost wasn't exactly accurate. Johnson, you're up. I think I have a short couple minutes left. First, there isn't any evidence that Monsanto went out and asked Lord David to go on this farm until they brought in this in April. Nobody contacted Lord David to talk to him until November 8, I think it was, of 2003 after harvest, after everything was plowed under and there wasn't anything, any living droid plants to test. He got a letter from a lawyer and this correspondence issued out after that. Brian Ojala was the director of the laboratory. Today, he's just a menial peon, it sounds like, but he was the director of that laboratory and it is the only evidence of the extent to which the Roundup Ready gene was in those fields. It is not substantive evidence. Even if it's data relied upon, it is not substantive evidence and therefore, it cannot form the basis of Monsanto's verdict. So, it's hearsay and... I'm not sure I understand what you're saying. The expert can rely on the data, but the data that the expert relies on is not substantive evidence itself. His conclusion is the evidence and when his conclusion is based 100% on the data from the tests being done by the non-testified expert, then his conclusion is no different than that it's not based on any substantive evidence. Normally, I want to make sure you're not arguing that an expert cannot testify based on evidence that would otherwise be inadmissible for hearsay reasons. I am not... No, I'm not saying that. But this typically occurs... You're saying it isn't that. No. I'm having a hard time distinguishing. No, no, no, no. That occurs when you have 806... when you have 806... or 8036 business records. Let's assume you don't have business records. We don't. Suppose you just have an expert testifying on the basis of a large amount of data collected by a group of people. For purposes of litigation. For purposes of litigation. Anything else? Just collected for purposes of litigation. Sure. It would be inadmissible if offered in a non-703 setting. Right? 703 permits that kind of evidence to be relied on, as I understand the rule, by the expert. Now, are you saying that's not so? Or are you saying, given that that's so, this case falls outside of that paradigm? I say, in my cases in my brief, say this also. Where you have a case-specific inquiry, that is, this case, you go to somebody and you say, give me some data, give me some test here for me, that's some expert. That expert comes in. That engineer comes in and testifies to what he did because it's case-specific. It's not an 8036 business record. You see, it sounds like you're saying that in order to get by 703, you have to have admissible evidence, as in business records. If it's a case, if it's, if it's for the purposes of litigation. Now, let's just say there's three or four other different types of evidence along with this, all right, and this is just one of them. That is not our case here. This is the only evidence that Kopachek had. And if it is not substantive evidence, then he had nothing, the rest of his testimony was irrelevant. This isn't a case where it's just one part of what they say is all his other testimony was over. Well, finally, one other thing that Kopachek said, that, I'm sorry. I just quickly wanted to ask you if Monsanto accurately represented what was argued in the district court, namely that you could infer that David would have planted the seed at the rate of 120 pounds per acre because he was stating that it wasn't newly purchased seed. Is that what they argued to the district court? I never heard the argument. This is the first time I heard it. David, you weren't trial counsel, right? Yes, I was. Oh, you weren't trial counsel, okay, good. I do all my hearings. Hey, you're not drawing a distinction there, but I'm not. Why do you think I bought water at the Federal Circuit instead of the Eighth Circuit then? I viewed this as a case that I was capable of doing. So how did the district court come up with the 120 pounds number? The district court took the testimony from Lauren's deposition, apparently. The district court, I think, doesn't understand farming, and that's probably my bad, and maybe I should have done more. So counsel didn't argue you should infer? No, that was argued today. That was not argued at the trial. It was not in the briefs. I just assumed that the district judge got mixed up. Well, we have a square conflict, I think, between the appellate counsel and your trial counsel. I think the district court got mixed up. I think what we need is if the parties who submit letters post-argument to us directed specifically to this point as to whether the argument, that is to say, the argument that the 120 pounds could be inferred to apply to the Roundup Ready C that had been saved because you weren't paying the market price for it. Is that argument made in support of the 120-pound figure that came into the evidence in connection with the bench constituency? Do both sides understand the question? Your Honor, we don't. If I suggested that we explicitly argued in the court that the 120-unit figure should be used because there was, because. Well, I may be putting some words in your mouth, but my understanding of your argument was that the amount of saved seed that would be used by someone who would not purchase it according to the contract would be greater than the amount that would be purchased. There's deposition testimony from Mr. David himself saying that I wouldn't use more than a unit or so per acre for Roundup Ready C because it's expensive. And all I'm suggesting is that that was the limitation that led him to plant lower amounts on these fields when he was paying for his seed and that the 120-unit figure was a fair figure to use when he wasn't paying for the seed. That's all we're suggesting. But that argument, the reference to the 120 figure was not actually an argument that was made to the district court. I don't think we explicitly said to the district court you should use 120 because he's doing that. I tried to point out to the district court that he was confusing the convention seed and Roundup Ready C to these testimonies, but I don't know how well I did on that. Thank you, Mr. Johnston. Thank you. Can I ask you to take another vote?